**In re IONOSPHERE CLUBS, INC. and Eastern Air Lines, Inc., Debtors.**

**AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Appellant,**

v.

**EASTERN AIR LINES, INC., Appellee.**

**Nos. 89 Civ. 6989 (RWS), 89 Civ. 7563 (RWS).**

United States District Court, S.D. New York.

April 10, 1990.

Cohen, Weiss and Simon, New York City (Peter D. DeChiara, Russell Hollander, James L. Linsey, Richard B. Miller, Richard M. Seltzer, of counsel), for appellant.

Weil, Gotshal & Manges, New York City (Bruce R. Zirinsky, Zack A. Clement, Sandra E. McFarland, of counsel), Akin, Gump, Strauss, Hauer & Feld, Washington, D.C. (John J. Gallagher, Joel M. Cohn, of counsel), for appellee.

## OPINION

SWEET, District Judge.

The Air Line Pilots Association, International ("ALPA") has appealed from two decisions of the Bankruptcy Court. The first decision denied its application for relief from the automatic stay to permit it, and to require respondent Eastern Airlines, Inc. ("Eastern"), to submit to arbitration a dispute over whether there has been a merger of the operations or facilities of Eastern and Continental Air Lines Inc ("Continental"). A finding that such a merger has occurred would trigger labor protective provisions, including certain seniority rights, contained in the collective bargaining agreement between ALPA and Eastern.

The second decision, made upon Eastern's application, enjoins ALPA from proceeding with a lawsuit initiated in the federal court in the Southern District of Florida. ALPA alleged in that action that certain leases of aircrafts, complete with crews, that Eastern had entered into with Continental (the "wet-leases") violated the collective bargaining agreement between it and Eastern. ALPA sought by the lawsuit to enjoin Eastern from continuing with "wet-leasing."

Both appeals present for resolution whether the Bankruptcy Code's automatic stay provision governs proceedings brought against a debtor-in-possession to enforce a collective bargaining agreement where the debtor has yet to obtain or seek an order under section 1113 of the Bankruptcy Code altering or relieving it of its obligations under such agreement. The conclusion, as set out below, is that enforcement of the stay under the circumstances here would circumvent the procedures implemented by Congress when it passed section 1113. Therefore, the orders of the Bankruptcy Court are reversed.

*The Parties*

ALPA is an unincorporated labor organization and the authorized collective bargaining representative under the Railway Labor Act ("RLA"), 45 U.S.C. section 151 *et seq.*, for all airline pilots (captains, first officers, and second officers) employed by Eastern. ALPA represents the Eastern pilot group through a coordinating council known as the Eastern Master Executive Council ("MEC").

Eastern is a corporation engaged in the business of providing air transportation service in interstate and foreign commerce and is a "carrier" subject to the RLA, 45 U.S.C. section 151, First. Eastern's principal place of business and its corporate headquarters are located in Miami, Florida. Its common stock is owned by Texas Air Corporation ("Texas Air"), which directs, controls, and manages the operations of Eastern and also those of Continental Air Lines, Inc. ("Continental"). Frank Lorenzo is Chairman of the Board of Directors for Texas Air, Eastern and Continental. Texas Air, in turn, is controlled by Jet Capital Corporation ("Jet Capital"). Lorenzo owns approximately 50.7% of the stock of Jet Capital and is its controlling stockholder.

The Official Committee of Unsecured Creditors (the "Committee") consists of numerous creditors of Eastern who have filed claims in the Chapter 11 proceeding, including ALPA. The Committee opposes ALPA's appeal.

*The Appeals*

In *In re Ionosphere Clubs, Inc.*, 105 B.R. 765 (Bankr.S.D.N.Y.1989) (*"Ionosphere*

*I*"), the Honorable Burton R. Lifland determined that the automatic stay of the Bankruptcy Code, 11 U.S.C. § 362, should not be lifted to permit ALPA to arbitrate, under either the auspices of the National Mediation Board or the System Board of Adjustment, a dispute over the interpretation and application of the labor protective provisions embodied in ALPA's and Eastern's collective bargaining agreement. ALPA appealed that decision, and argument was heard on December 8, 1989. Post-argument submissions occasioned by a decision of this court issued on January 24, 1990, were made by the parties in late January and early February, 1990.

In *Eastern Air Lines Inc. v. Airlines Pilots Association, International*, 105 B.R. 773 (Bankr.S.D.N.Y.1989) (*"Ionosphere II"*), Judge Lifland determined that the automatic stay barred ALPA from proceeding with a lawsuit it had filed in federal court in Florida against Eastern, by which ALPA sought to enjoin Eastern from engaging in the practice of wet-leasing. ALPA contended in that suit that Eastern's wet-leasing violated the terms of the collective bargaining agreement and the Railway Labor Act. Judge Lifland granted Eastern's application to enjoin ALPA from prosecuting the action. ALPA appealed that decision and, following extensive briefing, argument was heard on March 16, 1990.

This court has jurisdiction over these appeals under 28 U.S.C. § 158(a).

*Factual Background to the Appeals*

### A. The Contractual Relationship Between the Parties

Eastern and ALPA, as authorized representatives of the Eastern pilots, have for several years been parties to collective bargaining agreements governing the terms and conditions of pilot employment at Eastern. By letter of agreement dated March 20, 1982, ALPA and Eastern established a System Board of Adjustment ("System Board") of four members, two company members and two union members, to determine disputes arising under their labor contracts. The operation of such boards is contemplated under Title II of the Railway Labor Act ("RLA"), 45 U.S.C. § 184. Un-

der the terms of the arrangement, in the event that the four members of the System Board are unable to reach agreement within 30 days from the final submission of a grievance, either party may notify the System Board that a fifth member of the System Board is desired. The System Board thereupon selects a neutral from the panel of arbitrators (agreed to by both the parties) listed in the System Board Agreement. The selected neutral acts as the Chairman of the five member Board. A decision by a majority of the five member System Board is final and binding on both parties. In accordance with the RLA, the Letter Agreement provided that the System Board would have jurisdiction to resolve all disputes "growing out of grievances or out of interpretation or application of any of the terms of the Pilots' Agreement."

In 1986, Eastern and ALPA became parties to a new collective bargaining agreement dated February 23, 1986 (the "Eastern/ALPA Agreement" or "Agreement"). That Agreement was reached in the early morning hours of February 24, 1986, after months of intensive negotiations, during which Eastern was simultaneously bargaining with the International Association of Machinists ("IAM") and, against the possibility the labor talks would not result in favorable terms, negotiating terms of acquisition with Texas Air. In its entirety, the Eastern/ALPA Agreement that was concluded consisted of four handwritten pages. In addition to the phrases representing new areas of agreement, the handwritten pages incorporated by reference the parties' expired agreement.

Although able to reach this Agreement with ALPA, Eastern was unable to come to terms with the IAM, settlement with which Eastern concluded was essential to its survival in its then existing form. Eastern thereafter was acquired by Texas Air.

Eastern and ALPA negotiators reconvened several days after concluding that labor contract in an effort to expand the cryptic references in the Agreement to encompass all material terms of the new areas addressed. The parties were unable to agree on the material terms of six phrases,

one of which was the provision phrase which referred to Labor Protective Provisions ("LPPs"). That provision, in its entirety, read: "LPP's & Takeover: Similar to TWA—need to work out between EAL/ALPA legal counsel."

### B. *The LPP Grievance, the Strike and the Bankruptcy Filing*

On August 6, 1986 ALPA filed a grievance in connection with the disagreement over the LPP provision and submitted the grievance to the System Board on September 5, 1986. This grievance was designated as Eastern/ALPA System Board of Adjustment Arbitration Case No. 1–86 ("Arbitration Case No. 1–86"). Three months prior to then, on June 10, 1986, Eastern had filed suit in the Southern District of Florida to compel ALPA to resume bargaining on the LPP provision rather than arbitrate. After substantial litigation between Eastern and ALPA regarding the enforceability of the Eastern/ALPA Agreement, Eastern and ALPA were directed to submit the LPP controversy to arbitration. *Eastern Air Lines Inc. v. ALPA*, 670 F.Supp. 947 (S.D. Fla.1987), *aff'd*, 861 F.2d 1546 (11th Cir. 1988). In accordance with that determination, the grievance was submitted to the System Board. Arbitrator Frank Elkouri (the "Arbitrator"), a well-known expert in the field and the author of *How Arbitration Works*, was appointed as the fifth Board member and chairperson.

On April 19, 1988 hearings began on Arbitration Case No. 1–86. The purpose of that arbitration was to have the System Board define for the parties the precise terms of the labor protective provisions ("LPPs"). Eight days of hearings and substantial post-arbitration briefs spread over eight months. On February 7, 1989 by executive session of the System Board, it was agreed that the Arbitrator would proceed to prepare a proposed decision, following distribution of which the other Board members would have two weeks to review and, if desired, to request another executive session at which to modify or finalize the decision.

On March 4, 1989 Eastern's aircraft mechanics and ground service workers represented by IAM began a primary strike. ALPA agreed that its members would honor the IAM picket lines and strike Eastern in sympathy with the IAM. That same day, Arbitrator Elkouri mailed out his proposed decision to the members of the System Board.

On March 9, 1989, Eastern filed a petition in the Bankruptcy Court for this District under Chapter 11 of the Bankruptcy Code. The prior day, March 8, 1989, Arbitrator Elkouri issued a signed decision in Arbitration Case No. 1–86, which, contrary to the previously agreed upon procedure, became the Board's majority decision the next day upon being signed by the two ALPA System Board members. In the decision, as forecasted by his draft opinion, the Arbitrator concluded that the parties' cryptic language evinced an agreement to incorporate into their collective bargaining agreement sections 2(a), 3 and 13 of the LPPs applied to airline employees by the Civil Aeronautics Board ("CAB") in the Allegheny–Mohawk airline merger in 1972. *See Allegheny Mohawk Merger*, 59 C.A.B. 22 (1972).

Pursuant to this decision, in March 1989 ALPA requested that Lorenzo meet with the pilots to discuss integration of the Eastern and Continental seniority lists. ALPA asserted such integration was required under sections 2(a) and 3 of the LPPs, which provides that if Eastern and Continental "unify, consolidate, merge or pool in whole or in part their separate airline facilities or any of the operations or services previously performed by them" in a manner affecting the seniority rights of pilots, "provisions shall be made for the integration of seniority lists in a fair and equitable manner." The LPPs further provide in section 13 that any dispute arising

> [w]ith respect to the protections provided herein, which cannot be settled by the parties within 20 days after the controversy arises, [ ] may be referred by any party to an arbitrator selected from a panel of seven names furnished by the National Mediation Board for consideration and determination ... Expedited

hearings and decisions will be expected and a decision shall be rendered within 90 days after the controversy arises....

ALPA contended that by virtue of a number of asset transactions, Eastern had merged certain of its operations and or facilities with Continental within the meaning of section 2(a) of the LPPs. When Lorenzo and Eastern denied ALPA's request to discuss integration of the seniority list under the LPPs, ALPA requested that the grievance be submitted to arbitration pursuant to section 13 of the LPPs. Eastern also declined that request.

### C. *The LPP Proceedings Before the Bankruptcy Court*

On July 21, 1989, ALPA sought the entry of an order by the Bankruptcy Court declaring that the automatic stay provided by Bankruptcy Code section 362(a) did not apply to Arbitrator Elkouri's decision in Arbitration Case No. 1–86, because the decision had been finalized prior to the bankruptcy filing, or alternatively, for relief from the automatic stay to allow the System Board to complete its proceedings in Arbitration Case No. 1–86 by formally issuing the Elkouri decision. Eastern and the Committee did not oppose the lifting of the stay for the limited purpose of finalizing Elkouri's decision.

ALPA simultaneously sought relief from the automatic stay to commence a new arbitration proceeding to "implement" the Elkouri decision, a request which Eastern and the Committee did oppose, and, as noted, which Eastern previously had rejected. The purpose of the proposed arbitration, ALPA indicated, was to determine whether the acquisition of Eastern by Texas Air, and the occurrence of various pre-petition "asset transactions" among Texas Air, Eastern and Continental, constituted a "merger," as that term is defined in section

2(a) of the LPPs, so as to trigger the LPPs. If so, ALPA contended it would be entitled to damages, and more significantly, to the merger or "integration" of the pilot workforces of Continental and Eastern. The Bankruptcy Court, after briefing, held a hearing on August 14 on ALPA's motion to lift the automatic stay.

On September 11, 1989, the Bankruptcy Court issued its decision holding that ALPA "failed to show cause or special circumstances" as required by section 362(d)(1) warranting relief from the automatic stay, except to permit formal entry of the Elkouri award. *Ionosphere I*, 105 B.R. at 771.

The Court found that permitting an extensive arbitration over whether the pre-petition transactions between Continental and Eastern triggered the contractual LPPs would "usurp the bankruptcy court's critical role in the reorganization proceedings, affect special bankruptcy interests, and thwart the goal of judicial speed and economy" necessary to rehabilitate Eastern, *id.* at 771, by alienating determination of an issue that may lie at "the very heart" of Eastern's reorganization effort. *Id.* at 771.

The Bankruptcy Court found that the same asset transactions were the subject of the ongoing investigation by an independent examiner and had already been the subject of the National Mediation Board's investigation in the pending (and, according to the Court, stayed) single carrier proceeding.[1] *Id.* The Bankruptcy Court also specifically found that the new arbitration proceeding would require "great expenses" of money and time, and might result, contrary to ALPA's assurances, in a "substantial monetary award." *Id.* at 772. The Court concluded that the potential for substantial prejudice to the debtor's estate militated

---

1. On March 14, 1989, ALPA had filed a motion pursuant to Bankruptcy Code Section 1104(a) seeking the appointment of a Chapter 11 operating trustee. In support of its motion, ALPA contended that certain pre-petition asset transactions constituted mismanagement of Eastern. In response to ALPA's allegations, and at the request of Eastern, the Bankruptcy Court appointed an independent examiner (the "Examin-er"), agreed to by all parties in interest including ALPA, to conduct an investigation into ALPA's claims regarding the asset transactions, an investigation recently resulting in a substantial report to Judge Lifland after extensive review of documents and depositions. Following the issuance of that report on March 1, 1990, the parties submitted additional filings in this appeal.

against granting the relief sought by ALPA.

Finally, the Bankruptcy Court reasoned that the expertise of a labor arbitrator was not needed. The labor arbitration mandated by the opinion of the Eleventh Circuit had culminated in the issuance of the Elkouri award, which determined the specific content of the LPPs. *Ionosphere I,* at 771. The Bankruptcy Court noted that the requested second arbitration involved the "application of those terms," specifically the term "merger," to the asset transactions currently under examination by the Court. *Id.* Finding that the requested second arbitration touched on "special bankruptcy interests," the Bankruptcy Court concluded that the "special expertise of the [labor] arbitrator on the issue of whether there was a merger of Eastern and Continental is not needed." *Id.* For all these reasons, the Bankruptcy Court declined to lift the automatic stay to permit the arbitration, without considering whether the terms of the existing collective bargaining agreement and the LPPs called for the grievance to be arbitrated.

### D. *Related Interim Proceedings*

Outside of Bankruptcy Court and after the Chapter 11 filing, Eastern began a lawsuit in March 1989 in the Southern District of Florida seeking a declaratory judgment validating work rule changes that expanded the number of hours pilots were permitted to fly. Eastern never pursued that action, and it was dismissed *sua sponte* on July 17, 1989.

Eastern also filed an application in the Bankruptcy Court in June to reject its labor contract with ALPA pursuant to 11 U.S.C. section 1113, but thereafter withdrew that application before any action was taken upon it. On August 11, 1989, Eastern filed another lawsuit in the Southern District of Florida, this time seeking a declaratory judgment that its permanent replacement of strikers was lawful.

ALPA, meanwhile, submitted grievances challenging several labor practices instituted by Eastern, including Eastern's extension of permanent offers to pilots who had replaced strikers, its changes in flight bidding procedures, which allegedly denied seniority rights to returning former strikers, and its leasing from other airlines of planes complete with crews. ALPA sought, and Eastern declined, to arbitrate these disputes before the System Board, as, ALPA contended, was required under the RLA and pursuant to its collective bargaining agreement with Eastern.

### E. *The Wet–Leasing Lawsuit and the Injunction by the Bankruptcy Court*

On September 1, 1989, ALPA filed suit in the United States District Court for the Southern District of Florida to stop Eastern's post-petition practice of leasing planes and crews from other airlines to fly Eastern routes—the "wet leasing" lawsuit that is the subject of the second appeal. *ALPA v. Eastern,* Civ. No. 89–1823. In its complaint, ALPA alleged that Eastern began wet-leasing in August 1989 and that the wet-leasing violated the Eastern–ALPA collective bargaining agreement with the RLA. ALPA's claim was based on the "scope" clause of that agreement, which it says requires Eastern to employ ALPA represented pilots on the Eastern pilot system seniority list to perform any and all Eastern flying, and, thus, bars the practice of wet-leasing with non-Eastern pilots.[2] The complaint sought injunctive relief pursuant to the RLA prohibiting the wet-leasing or in the alternative, an injunction pending expedited arbitration before the System Board. The complaint also sought monetary relief to make whole ALPA-represented Eastern pilots.

On September 13, ALPA moved for expedited discovery from Eastern, which was granted on September 26 in an order set-

---

**2.** Section 1 of the Agreement provides:
It is agreed that all present or future flying including flight training (except for initial factory-conducted training in newly purchased equipment), revenue flying, ferry flights, char-

ters and wet-leases performed in or for the service of Eastern Air Lines, Inc., shall be performed by pilots whose names appear on the then-current Eastern Air Lines' System Seniority List.

ting a trial date of October 30 for the preliminary injunctive relief request.

On September 25, 1989, Eastern brought by order to show cause an adversary complaint and motion for preliminary injunction in the Bankruptcy Court to enjoin ALPA's lawsuit as a violation of the stay and as burdensome to the Chapter 11 estate. Judge Lifland issued a temporary restraining order enjoining ALPA from continuing the prosecution of the wet-leasing suit pending hearing in Bankruptcy Court of Eastern's preliminary injunction motion. A hearing on the motion was held and, shortly thereafter, the wet-leasing action was enjoined by the Bankruptcy Court on October 4, 1989 as a violation of the automatic stay provision of 11 U.S.C. § 362. The court also invoked its authority under 11 U.S.C. § 105 as support for the injunction, holding the lawsuit was an attempt to interfere with the Bankruptcy Court's exclusive jurisdiction over the administration and property of the estate.

Judge Lifland's opinion concluded that the purpose of the protection provided by Chapter 11 "is to give the debtor a breathing spell, an opportunity to rehabilitate its business and to enable the debtor to generate revenue." *Ionosphere II*, 105 B.R. at 777. Relying upon the Supreme Court decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the court emphasized that rehabilitation of the debtor is the "[p]aramount policy of Chapter 11, to which all other bankruptcy policies are subordinated." *Id.* at 777 (quoting *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176–77 (Bankr.S.D.N.Y. 1989)). The court further noted that the point of the automatic stay was to "permit[] the debtor-in-possession and its management to have a breathing spell from creditors pursuing their claims ... so they may concentrate on the debtor's business and rehabilitation effort." *Id.* at 779 (citation omitted).

The court therefore held that ALPA's lawsuit to enjoin wet-leasing violated automatic stay provision section 362(a)(3), since the suit "obstructs Eastern in its rebuilding efforts by controlling the manner in which

it uses its assets." *Id.* The court did not directly address ALPA's argument that the passage of section 1113 modified the automatic stay provision of the Code as applied to actions against a debtor to enforce a collective bargaining agreement, although the court acknowledged ALPA's contention that a debtor's application under section 1113 of the Code was the exclusive procedure by which a debtor could alter its collective bargaining agreement in bankruptcy. *Id.* at 779.

Judge Lifland further ruled that the Bankruptcy Court had authority under section 105 of the Code to enjoin any proceeding which interferes with the rehabilitative process, *id.* at 778, or that impairs the court's exclusive jurisdiction over any issue that involves the administration and assets of the debtor's estate. The court therefore concluded it had exclusive jurisdiction over ALPA's complaint, and could enjoin the Florida action, since any injunction of the wet-leasing practices that issued from the federal court in Florida (presumably upon a finding there that the practice violated the collective bargaining agreement) would have a "substantial and irreparable detrimental impact on [Eastern's] reorganization." *Id.* at 780.

### G. *Proceedings and Developments Subsequent to the Appeals*

Following these rulings by the Bankruptcy Court, on November 22, 1989, ALPA advised Eastern that it was ending its sympathy strike against the airline. That set in motion a number of litigation events.

Two days after notice of this turn in events, Eastern moved to amend the complaint it had filed in federal court in Florida to raise additional issues, including whether it could continue in effect work rules that allegedly deny ALPA's returning strikers their seniority rights. On December 8, 1989, ALPA sought to consolidate and expedite for hearing before the System Board the various grievances it had previously filed there, which included grievances relating to the strike replacement and work rule issues.

On December 11, 1989, ALPA notified the District Court in Florida that it consented to the filing of Eastern's proposed amended complaint in the proceeding Eastern had initiated there, and that it planned to file counterclaims that would put in issue not only Eastern's bids and hiring of permanent replacements for striking ALPA pilots, but also Eastern's alleged improper refusal to bargain with ALPA and alleged attempt to undermine ALPA's status as bargaining agent.

The same day, Eastern initiated an adversary proceeding in Bankruptcy Court placing before Judge Lifland the same issues ALPA was seeking to arbitrate before the System Board under the RLA, and which Eastern had theretofore sought to litigate in federal court in Florida. (This adversary complaint apparently did not address or seek determination of the wet-leasing issue ALPA had raised in its action filed in federal court in Florida or the LPP merger dispute ALPA had sought to arbitrate.) Eastern secured a temporary restraining order from the Bankruptcy Court halting the proposed System Board arbitration and a hearing in that court was scheduled for December 15. The next day, December 12, Eastern moved in the Southern District of Florida to withdraw its motion to amend the complaint in that Court, thereby seeking to head off ALPA's proposed counterclaims and to avoid placing the grievance and work rule issues before the Florida court.

On December 13, ALPA filed an application in this Court to withdraw Eastern's adversary proceeding from the Bankruptcy Court pursuant to the mandatory withdrawal provision, 28 U.S.C. § 157(d), and to have the proceeding transferred to the Southern District of Florida. That filing resulted in the stay of the December 15th bankruptcy court hearing. The District Court in *Eastern Airlines, Inc. v. Air Line Pilots Ass'n, Intl,* 89 Civ. 8250 (MBM), 1990 WL 5203 (*"Eastern Airlines"*) on January 24, 1990 denied ALPA's motion to withdraw the adversary proceeding from Bankruptcy Court in a careful 26 page opinion rendered by the Honorable Michael B. Mukasey.

*The Issues Presented*

From this welter of prior and related proceedings three issues emerge as relevant to the determination of these appeals. Each bears on the larger question of when and in what forum collectively bargained-for rights may be enforced against an employer who has sought protection from creditors in bankruptcy.

1. Does section 362(a) of the Bankruptcy Code automatically stay actions to enforce a collective bargaining agreement, where the debtor has not sought rejection or alteration of the terms of the agreement under section 1113 of the Bankruptcy Code?

2. If section 362(a) stays such actions, did the Bankruptcy Court abuse its discretion in refusing ALPA's request for relief from the stay to arbitrate the LPP merger dispute?

3. If section 362(a) does not stay such actions, did section 105 of the Bankruptcy Code nevertheless authorize the Bankruptcy Court to enjoin the wet-leasing suit?

I. *Section 1113 Bars Application of the Automatic Stay to the Disputes over LPP Arbitration and Wet–Leasing*

A. *The Effect of Section 1113 is Properly Considered in these Appeals*

In the first proceeding, ALPA requested an order from the Bankruptcy Court lifting the automatic stay to permit it to arbitrate the rights of Eastern pilots to receive the benefit of labor protective provisions negotiated between Eastern and ALPA over three years ago (the "LPP dispute"). Failing to secure permission from the Bankruptcy Court under section 362(d) of the Code to proceed with that arbitration, ALPA now argues that the law does not require that it seek or obtain authorization from the bankruptcy court to initiate arbitration of the LPP dispute. ALPA failed to argue below, but insists on appeal, that in enacting Bankruptcy Code section 1113 in 1984, Congress effectively removed labor arbitrations and other actions to enforce rights under collective bargaining

agreements from the scope of the automatic stay provision of section 362(a).

■ Arguments or issues not raised before a lower court ordinarily are not addressed on appeal. *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). The rule has been applied to refuse consideration to arguments litigants failed to raise initially in the bankruptcy court. *See, e.g., Truck Drivers Local 807 v. Carey Transportation Inc.,* 816 F.2d 82, 90 (2d Cir.1987) (circuit court would not consider argument in bankruptcy appeal which was not raised in either the district court or bankruptcy court); *see also In re Marvin Properties, Inc.,* 854 F.2d 1183, 1186–87 (9th Cir.1988) (district court could properly decline to entertain issue not raised below where party offered no reason for its failure and no manifest injustice would result); *In re Ozark Restaurant Equipment Co.,* 850 F.2d 342, 345–46 (8th Cir.1988) (district court properly determined that it was not empowered to consider an issue not raised in the bankruptcy court); *Liakas v. Creditors' Committee of Deja Vu, Inc.,* 780 F.2d 176, 179 (1st Cir.1986); *In re REA Holding Corp.,* 2 B.R. 733, 737 (S.D.N.Y.1980).

Notwithstanding these authorities, appellate courts—including district courts sitting as appellate courts in bankruptcy matters—frequently do address legal arguments raised for the first time on appeal where the argument is clearly presented by the record. *See e.g., In re Air Conditioning Inc. of Stuart,* 845 F.2d 293, 299 (11th Cir.) (district court did not abuse its discretion in resolving issue presented for the first time on appeal from a bankruptcy court), *cert. denied,* 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988); *Matter of Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1379–80 (9th Cir.1985) (district court has "power to consider any issue presented by the record even if the issue was not presented to the bankruptcy court"); *Abex Corp. v. Ski's Enterprises, Inc.,* 748 F.2d 513, 516 (9th Cir.1984) ("It is well settled in this Circuit that where the new issue is purely a legal one ... we may resolve it on appeal"); *Vintero Corp. v. Corporacion Venezolana*

*de Fomento,* 675 F.2d 513, 515 (2d Cir. 1982) ("when a party raises new contentions that involve only questions of law, an appellate court may consider the new issues"); *North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 699 (2d Cir.1972) (an appellate court may consider legal theories not relied upon below); *Foster v. United States,* 329 F.2d 717, 718 (2d Cir.1964) ("[t]hese contentions are wholly different from the points raised in the court below, but since only a question of law is involved, we will proceed to consider them"); *In re Weeks, Thomas & Lysaught,* 97 B.R. 46, 46–47 (D.Kan.1988) ("[w]hen sitting as a court of review over the bankruptcy court, the district court has power to consider any issue presented by the record, even if the issue was not presented to the bankruptcy court"); *Rubel v. Brimacombe & Schlecte, P.C.,* 86 B.R. 81, 83 (E.D.Mich.1988) (appellee's claim that district court cannot consider legal issues not raised before the bankruptcy court is without merit).

■ Here, ALPA was aware of the existence of the section 1113 argument at the time of its application for relief from the stay, yet did not place the issue before the Bankruptcy Court. That failing notwithstanding, the argument presents purely legal issues that do not raise facts outside the record, and the record in that proceeding squarely presents for determination the question of section 1113's impact on the automatic stay. If ALPA is correct in its legal contention that the stay is modified by section 1113, then permission of the bankruptcy court was not necessary to proceed with the arbitration and the order foreclosing arbitration was a nullity. This potential injustice makes it appropriate to consider ALPA's section 1113 argument in the first appeal.

That conclusion is eased by, although reached independently of, the fact that the same legal argument is providently raised by the second appeal. In the second proceeding—brought by Eastern to prevent ALPA from continuing with its federal court action to enjoin Eastern's wet-leasing—Eastern argued to Judge Lifland that

the automatic stay rendered ALPA's Florida action a nullity. ALPA's reply in the Bankruptcy Court was the same as that now asserted in the first appeal—that the automatic stay does not apply to actions to enforce rights arising under labor agreements.

■ Thus, in both appeals, ALPA's position rests on the proposition, endorsed in *In re Marine Pollution Services, Inc.,* 88 B.R. 588, 594–95 (S.D.N.Y.), *rev'd on other grounds,* 857 F.2d 91 (2d Cir.1988) (*"Marine Pollution"*), that the automatic stay of section 362(a) of the Bankruptcy Code, insofar as it applies to enforcement of rights arising under labor agreements, does not survive the passage of section 1113 of the Code. That endorsement was essentially *dictum,* since the *Marine Pollution* court already had determined that because the claim in question did not threaten to encumber property of the estate, "no interest protected" by the automatic stay was in fact implicated by the labor proceeding there in question. *Id.* at 595.

Even so, the *Marine Pollution* court's analysis cannot be lightly disregarded. The court found that in section 1113, Congress took away from debtors the statutory license to unilaterally violate their collective bargaining agreements upon the filing of a bankruptcy petition and instead required debtors to obtain the bankruptcy court's authorization prior to implementing contract modifications. It thus reasoned that

> [i]t would be anomalous to find that Congress enacted a mandatory procedure for rejecting a collective bargaining agreement without which the agreement stays in full force and effect [11 U.S.C. § 1113], and then to hold that a previously enacted section of the same statute—11 U.S.C. § 362, providing for a stay of claims against a debtor's estate—automatically invalidates the arbitration clause of a collective bargaining agreement....

*Id.,* 88 B.R. at 595. Evaluation of the soundness of that conclusion depends upon an examination of both of these sections of the Bankruptcy Code, as well as their historical relationship.

### B. The Scope and Purpose of the Automatic Stay

Upon the filing of a petition for reorganization under Chapter 11, section 362(a) of the Bankruptcy Code operates to stay the commencement of a proceeding against the debtor that could have been commenced before the bankruptcy filing or that has as its purpose the recovery of a claim that arose prior to the bankruptcy filing. 11 U.S.C. § 362(a)(1). The section also forecloses actions, regardless of date arising, which seek to control or obtain property of the debtor's estate. 11 U.S.C. § 362(a)(3). The stay is "applicable to all entities" and extends to any form of "judicial, administrative or other action or proceeding," except those exempted from its operation under § 362(b), *see* 11 U.S.C. § 362(a), or by some other provision of Title 11, *see, e.g.,* 11 U.S.C. §§ 1110(a), 1168(a).

The stay is intended to "give[ ] the debtor a breathing spell from his creditors," "permit[ ] the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." S.Rep. No. 95–989, 95th Cong., 1st Sess. 54–55, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5840–41. *See also* H.Rep. No. 95–595, 95th Cong., 1st Sess. 340–41, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5963, 6296–97; *In re Stringer,* 847 F.2d 549, 551–52 (9th Cir.1988); *Matter of Kozak Farms, Inc.,* 47 B.R. 399, 402 (D.Mo.1985); *In re Colin, Hochstin Co.,* 41 B.R. 322, 355 (Bkrtcy.S.D.N.Y.1984). The stay also protects creditors' interests by preserving their relative positions and preserving the remains of the debtor's estate against unsupervised dissipation through a " 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *In re Chateaugay Corp.,* 93 B.R. 26, 30 (S.D.N.Y.1988) (quoting *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55 (2d Cir.1976), *cert. denied,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977)). *See also* 1978 U.S.Code Cong. &

Admin.News (1978) 5963, 6297 (House Report); *In re Stringer*, 847 F.2d at 551; *United States v. Sayres*, 43 B.R. 437, 439 (S.D.N.Y.1984).

Prior to passage of section 1113, it appears that no appellate determination was made as to whether section 362 stayed actions brought to interpret, arbitrate or enforce collective bargaining agreements to which the debtor is a party, although the broad language of the stay strongly suggests that it did.[3] Relying upon that language, several bankruptcy courts considering bankruptcy petitions filed prior to July 10, 1984 (the effective date of section 1113) so found. *E.g., In re Flechtner Packing Co.*, 63 B.R. 585, 588 (Bankr.N.D.Ohio 1986); *In re Valley Kitchens*, 58 B.R. 6, 8 (Bankr.S.D.Ohio 1985); *In re Penn Fruit Company, Inc.*, 1 B.R. 714, 716 (Bankr.E.D.Pa.1979). Consistent with that view, labor representatives, much as other litigants, frequently sought relief in bankruptcy court from the automatic stay pursuant to section 362(d), in order to continue or commence suits or arbitrations arising under collective bargaining agreements. *See, e.g., In re Midwest Emery Freight System, Inc.*, 48 B.R. 566, 569 (Bankr.N.D.Ill.1985); *In re Sterling Mining Co.*, 21 B.R. 66, 67 (Bankr.W.D.Va.1982); *In re Allen & Hein, Inc.*, 59 B.R. 733, 734 (Bankr.S.D.Cal.1986); *In re Smith Jones, Inc.*, 17 B.R. 126, 127 (Bankr.D.Minn.1981).

Thus, the generalized understanding of 11 U.S.C. section 362(a) prior to passage of 11 U.S.C. section 1113 was that it stays efforts to enforce labor agreements against debtor-signatories much as it halts efforts by other creditors to commence proceedings against the debtor. These appeals present the question as to the effect of the enactment of 11 U.S.C. section 1113 upon that received understanding.

### C. *The Scope and Purpose of Section 1113*

Congress enacted 11 U.S.C. § 1113 as "an elaborate and thoroughgoing revision of the [collective bargaining agreement] rejection process." *Matter of K & B Mounting*, 50 B.R. 460, 462–63 n. 3 (Bankr.N.D. Ind.1985). This section of the Bankruptcy Code, one of several amendments to title 11 contained within the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (July 10, 1984) (the " '84 Act"), sets forth in some detail the standards and procedures that govern the assumption or rejection of labor agreements by parties who have entered into bankruptcy.

### (i) *Pre–Bildisco Bankruptcy Treatment of Debtor Labor Agreements*

Section 1113's impact, if any, upon the automatic stay provision of the Code requires an understanding of the legal landscape an employer in bankruptcy faced prior to the 1984 bankruptcy amendments. Before then, a debtor's decision to assume or reject a collective bargaining agreement was governed by section 365(a) of the Code. *See, e.g., Shopmen's Local Union*

---

**3.** *Garland Coal & Mining Co. v. United Mine Workers*, 778 F.2d 1297, 1304 (8th Cir.1985), is a possible exception. There the court, after noting that "there is a question whether consideration of the [union's] claims [against the employer in bankruptcy] violates the automatic stay provision" and that "there was some authority for the proposition that the section 362 stay applies to labor arbitrations," assumed the stay had that effect but lifted it *sua sponte.* It then ordered the district court to issue an injunction requiring the employer to arbitrate certain labor grievances and to consider on the merits the Union's claim that other, non-arbitrable grievances constituted violations by the employer of the labor laws.

Neither of the appellate decisions cited by Eastern, *N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir.1985), or *Truck Driv-*ers Local Union No. 807 v. Bohack Corp., 541 F.2d 312, 320 (2d Cir.1976), *cert. denied*, 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 117 (1978), address the effect of the automatic stay provision upon actions to enforce or arbitrate labor agreements. *Bohack* held bankruptcy court approval was required for arbitration of labor grievance under Rule 919(b) of the Bankruptcy Rules, but contained no discussion of the effect of the stay. Nor did *Superior Forwarding*, a decision which relied upon *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) to hold that section 105 of the Bankruptcy Code permitted a bankruptcy court to enjoin the NLRB from proceeding with a hearing on unfair labor charges filed against a debtor who had filed an application with bankruptcy court to reject its collective bargaining obligations.

*No. 455 v. Kevin Steel Products*, 519 F.2d 698, 706 (2d Cir.1975) (collective bargaining agreements are species of executory contracts subject to section 365(a) rejection).[4] This Code provision addressed the general subject of a debtor's assumption, avoidance or alteration of its obligations under executory contracts, once a petition for reorganization was filed. *See generally* Countryman, *Executory Contracts in Bankruptcy: Part II*, 58 Minn.L.Rev. 479 (1974).[5]

Under section 365(a), a bankruptcy court could approve the debtor's rejection of ordinary business contracts in those cases where such an act would in the exercise of business judgment appear to improve the financial status of the debtor. 2 *Collier on Bankruptcy* ¶ 365.03 at 365–18 to 365–20 (15th ed. 1989). Although the statutory provision did not single out labor agreements for differential treatment, higher (and less than uniform) standards than this traditional "business judgment" test were developed in the courts to govern the rejection of labor contracts, compelled by judicial recognition of the special nature of collective bargaining agreements and the serious consequences of rejection for employees. *See In re Brada Miller Freight*

*Systems, Inc.*, 702 F.2d 890, 899 (11th Cir. 1983) (where contract burdens the estate and equities balance in favor of rejection, agreement subject to abrogation); *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164, 169 (2d Cir.1975) (rejection permissible only where employer will otherwise collapse).

The courts also addressed the question of how to treat an employer's labor contract obligations in the period after the filing of a bankruptcy petition but before a ruling by the bankruptcy court upon the employer's application for relief from the contract under 11 U.S.C. § 365(a). One view was that these labor obligations of the debtor, like those arising under regular executory contracts, were unenforceable in this interim period, because the filing of the petition created a juridical entity—the debtor-in-possession—distinct from the employer and not bound by the employer's contracts unless and until those contractual obligations were expressly assumed by the debtor-in-possession in bankruptcy court. *See In re Bildisco*, 682 F.2d 72, 78–79 (3d Cir.1982) (relying in part upon *Kevin Steel Products*, 519 F.2d 698, 704 (2d Cir.1975)), *aff'd on*

---

**4.** An exception to this rule were railroad collective bargaining agreements subject to the Railway Labor Act. By express limitation set forth in Section 1167(a) of the Code, 11 U.S.C. § 1167(a), Congress provided that "[n]otwithstanding section 365 of this title, neither the court nor the trustee may change the wages or working conditions of employees of the debtor" governed by such an agreement subject to the RLA, "except in accordance with section 6 of such Act [45 U.S.C. 156]." Thus, a railroad debtor-in-possession seeking to modify or reject its labor contract was required to observe the standards and procedures set forth in the RLA, and the bankruptcy court determining whether to permit such modifications or rejection was obliged to apply the standards of section 6 of the RLA, not Section 365 of the Bankruptcy Code.

The parties do not question that this provision has no application to an airline carrier in reorganization. *See In re Air Florida System, Inc.*, 48 B.R. 440 (Bkrptcy.D.Fla.1985).

**5.** Subsection 365(a) of the Code, 11 U.S.C. § 365, reads: "(a) ... the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." The statutory language discusses the possibility of assumption as well as rejection, reflecting the fact that upon the filing of a bankruptcy petition, the debtor-in-possession could not automatically be assumed to take title to all of the debtor's prior agreements. Under Section 365(d)(2), a debtor-in-possession in chapter 11 has until a reorganization plan is confirmed to determine if it will accept or reject an executory contract. 2 *Collier on Bankruptcy* ¶ 365.03 at 365–27 (15th ed. 1989). Under the Code, this does not mean that upon filing of the petition, these contracts of the debtor are devoid of all force and effect. The Code permits the beneficiaries of such executory contracts to file administrative claims in bankruptcy court premised upon their rights under the contracts, and if the debtor-in-possession ultimately rejects such a contract, a claim of damages for breach is provided for by the Code. *Id.* at 365–20 (size of claim flowing from breach by rejection is element to be considered in applying business judgment test). But pending the debtor's assumption or rejection, Section 365 does not authorize enforcement of such executory contracts against the unwilling debtor-in-possession, although at the request of the non-debtor party to such a contract, the court "may order the trustee to determine within a specified period of time whether to assume or reject." *Id.* at 365–30.

*other grounds*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Other courts held that the filing of a petition did not relieve the employer from its general obligations arising under collective bargaining agreements or the labor laws, except to the limited extent necessary to accommodate actual conflicts between the bankruptcy and labor laws. *Truck Drivers Local Union No. 807 v. Bohack Corp.*, 541 F.2d 312, 320 (2d Cir.1976), *cert. denied*, 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 117 (1978).

The issues of the timing and relative ease or difficulty with which employers could free themselves from obligations imposed by their collective bargaining agreements through reorganization proceedings became subjects of increased debate, and of Congressional inquiry, after several well-publicized incidents of employer-coordinated bankruptcy filings and wage reductions. *See* Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances*, 58 Am.Bankr.L.J. 293, 312 (1984). The same questions came to occupy the Supreme Court's attention in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) ("Bildisco").

### (ii) *Bildisco: Non-enforceability of Debtor's Labor Contracts*

In *Bildisco*, the Court addressed what standard would govern rejection of a labor agreement under section 365(a), and, as well, whether a labor agreement was enforceable against the debtor once the debtor had filed its reorganization petition but prior to its court-sanctioned rejection of such an agreement. With respect to the former issue, the court unanimously held that labor contracts had characteristics sufficiently distinct from ordinary executory contracts to warrant the application of a higher standard for their renunciation pursuant to section 365(a) in bankruptcy court. *Bildisco*, 465 U.S. at 524, 104 S.Ct. at 1195 (majority opinion), 465 U.S. at 535, 104 S.Ct. at 1201 (dissent). The standard adopted, while not so high as the one enunciated by the Second Circuit in *REA Express* (that standard denied section 365(a)

rejection unless an employer could demonstrate reorganization would otherwise fail), required the bankruptcy court to consider the effect of rejection upon parties other than the employer alone. All the justices concurred that section 365 of the Code permitted a bankruptcy court to approve a debtor in possession's rejection of a collective-bargaining agreement only upon a showing that the "agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *Id.*, 465 U.S. at 526, 535, 104 S.Ct. at 1196, 1201. Thus, the imputed standard was substantially more strict than the business judgment test applicable to ordinary executory contracts, the exclusive focus of which was the relative benefits of unburdening the estate. *See In re Century Brass Products, Inc.*, 795 F.2d 265, 271–72 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (186) (*"Century Brass Products"*).

The second issue considered in *Bildisco*—whether the terms of the collective bargaining agreement could be enforced against a debtor who unilaterally alters or modifies its terms after the petition was filed but before a decision had been made as to contract rejection—produced no such unanimity. The five justices composing the majority reasoned that labor contracts, like other executory contracts, could not be enforced against the debtor once a bankruptcy filing had been made. The majority opinion acknowledged that the labor laws ordinarily provide protection "when contractual obligations are repudiated by the unilateral actions of a party to the collective-bargaining agreement." *Id.*, 465 U.S. at 532, 104 S.Ct. at 1199. In a Chapter 11 case, however, the Court explained that

> the 'modification' in the agreement has been accomplished not by the employer's unilateral action, but rather by operation of law. Since the filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable, [NLRA] procedures have no application to the employer's unilateral rejection of an already unenforceable contract.

465 U.S. at 533, 104 S.Ct. at 1199–1200.

Central to the majority's analysis in *Bildisco* was the proposition that provisions of

the Bankruptcy Code (sections 365, 501 and 502, and the automatic stay, section 362(a)), rendered executory contracts, including collective labor agreements, unenforceable from the moment of the bankruptcy filing:

> Actions on claims that have been or could have been brought before the filing of a bankruptcy petition are, with limited exceptions not relevant here, stayed through the automatic stay provisions of the Bankruptcy Code. 11 U.S.C. § 362(a) (1982 ed.). The Bankruptcy Code specifies that the rejection of an executory contract which had not been assumed constitutes a breach of the contract which relates back to the date immediately preceding the filing of a petition in bankruptcy. 11 U.S.C. § 365(g)(1) (1982 ed.). Consequently, claims arising after filing, such as result from the rejection of an executory contract, must also be presented through the normal administration process by which claims are estimated and classified. See 11 U.S.C. § 502(g) (1982 ed.); *In re R. Hoe & Co.,* 508 F.2d 1126, 1132 (CA2 1974); *Workman v. Harrison,* 282 F.2d 693, 699 (CA10 1960). *Thus suit may not be brought against the debtor-in-possession under the collective-bargaining agreement; recovery may be had only through administration of the claim in bankruptcy.*

465 U.S. at 529–530, 104 S.Ct. at 1198 (footnotes omitted; emphasis supplied).[6]

That did not mean that an employer who ceased to abide by the terms of the agreement upon making a filing was forever insulated from those terms. Within the bankruptcy court, the employees might file monetary claims arising from the breach of the terms of the labor agreement (including, the majority noted, "unliquidated losses attributable to fringe benefits or security provisions like seniority rights"). *Id.* at

530 & n. 12, 104 S.Ct. at 1198 & n. 12. However, the *Bildisco* majority left no doubt that the employer who filed for bankruptcy would not be required to defend against actions that sought to enforce the existing agreement, even prior to the employer's receipt of approval from the bankruptcy court of its rejection. Enforcement in that interim period was contrary to the noted Code provisions and "the Code's overall effort to give a debtor-in-possession some flexibility and breathing space." 465 U.S. at 532, 104 S.Ct. at 1199 (citation omitted).

This holding, composing Part III of the Court's opinion, resulted in the dissenting opinion of Justice Brennan, joined in by Justices White, Marshall and Blackmun. In their view, prior to court-approved rejection the labor contract remained in effect. *Bildisco,* 465 U.S. at 535, 545, 104 S.Ct. at 1201, 1206. A debtor in possession who wished to alter the terms of an existing agreement was not, by virtue of filing a chapter 11 petition, freed from complying with provisions of the labor laws governing termination or modification of labor contracts (such as the section 8(d) provisions of the National Labor Relations Act requiring that notice of proposed modifications be given in advance and that terms of the existing contract be adhered to for at least sixty days after such notice is given). *Id.* at 541–47, 104 S.Ct. at 1204–07. Such relief came when—but not before—the debtor had complied with the statutory scheme, which required a determination from the bankruptcy court that the debtor was released from the existing agreement:

> [T]he primary goal of Chapter 11 is to enable a debtor to restructure his business so as to be able to continue operating. Unquestionably, the option to reject an executory contract is essential to this

---

**6.** The majority's reliance on these provisions took the place of the lower court's juridical entity approach. *See In re Bildisco,* 682 F.2d 72, 78–79 (3d Cir.1982). As the Court observed, 465 U.S. at 528, 104 S.Ct. at 1197, if the debtor in possession

> were a wholly 'new entity,' it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not

> be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing.

goal. But the option to violate a collective bargaining agreement before it is rejected is scarcely vital to insuring successful reorganization. For if a contract is so burdensome that even temporary adherence will seriously jeopardize the reorganization, the debtor in possession may seek the Bankruptcy Court's permission to reject that contract.

465 U.S. at 550–51, 104 S.Ct. at 1209 (citation omitted).

### (iii) *The Provisions of Section 1113*

With this background, the changes rendered by the enactment of section 1113 take on more traceable form. As our Court of Appeals has observed, the *Bildisco* decision "sparked intense Congressional debate" concerning the tension between labor and bankruptcy law, *Century Brass Products*, 795 F.2d 265, 267 (2d Cir.1986), "culminating within a few months in the passage of section 1113." *Truck Drivers Local 807 v. Carey Transp. Inc.*, 816 F.2d 82, 87 (2d Cir.1987) (*"Carey Transportation"*).

First—and this much was congruent with the *Bildisco* decision—Congress confirmed by passage of section 1113 that in bankruptcy proceedings, labor contracts were not to subject to the same substantive standards for rejection that governed other contracts. The '84 Act removed collective bargaining agreements from the coverage of section 365(a), which applied to debtor modification of executory contracts generally, and placed such agreements under the governance of section 1113. The courts previously had construed section 365 as governing rejection of labor agreements but had read into the law higher standards for rejection for such agreements; in section 1113, Congress incorporated and refined the higher standard that had been recognized as applicable to rejection of labor agreements in *Bildisco*. *See Carey Transportation*, 816 F.2d at 88.

Unlike section 365(a), however, section 1113 sets forth detailed procedural and substantive requirements a debtor must follow before a bankruptcy court may approve the debtor's alteration or rejection of a collective bargaining agreement. *See generally* Gibson, *The New Law on Rejec-*

*tion of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113*, 58 Am.Bankr.L.J. 325, 328–45; Bernstein, S.B., *Bankruptcy Practice After the Amendments Act of 1984* at 121–135 (PEC 1984); *Matter of K. & B. Mounting, Inc.*, 50 B.R. at 462–67. The procedures include making a proposal to the authorized representative of the employees covered by such agreement, conferring in good faith over proposed modifications, and providing "such relevant information as is necessary to evaluate the proposal." 11 U.S.C. § 1113(b)(1)(A) & (B); *see also Century Brass Products*, 795 F.2d at 273.

If bargaining does not lead to agreement upon a proposal, the debtor may file a motion for rejection or modification of the existing collective bargaining agreement. As noted, the court adjudicates that motion under the standards set forth in section 1113, which include the requirements that the debtor's proposal contain only those modifications that are "necessary" for a successful reorganization, that the proposal fairly and equitably spreads the economic sacrifice, that the union rejected the proposal without "good cause," and that the balance of the equities favors rejection. 11 U.S.C. § 1113(c); *see also Carey Transportation*, 816 F.2d at 88; *Century Brass Products*, 795 F.2d at 273.

Finally, section 1113 provides in two different subsections that its provisions are the exclusive remedy in the Code for a debtor to modify its collective bargaining agreement. Section 1113(a) provides that a debtor may reject a collective bargaining agreement "only in accordance with the provisions of this section." Section 1113(f) states that:

> [n]o provision of [the Bankruptcy Code] shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113(f).

### D. *Post–Bankruptcy Petition Enforcement of Collective Bargaining Agreements after Section 1113*

The above-noted requirement that a debtor "assume or reject a collective bargaining

agreement *only* in accordance with the provisions of this section," 11 U.S.C. § 1113(a), and the Code's clarification that a debtor who seeks protection in bankruptcy by filing a petition does not thereby gain license under the Code "to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions" of section 1113, 11 U.S.C. § 1113(f), firmly evince Congress' determination to reverse the *Bildisco* majority's conclusion that upon filing a petition, the bankruptcy laws permitted an employer unilaterally to reject the terms of a collective bargaining agreement prior to receiving the bankruptcy court's approval.[7] Thus, courts have had no difficulty discerning that "Section 1113 reversed the second part of *Bildisco*." *Century Brass Products*, 795 F.2d 265, 266, 272 (2d Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986) (further stating that Congress "overrul[ed] the unilateral power to reject given the debtor in *Bildisco* "); *In re Unimet Corp.*, 842 F.2d 879, 884 (6th Cir.), *cert. denied*, 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988) ("section 1113 unequivocally prohibits the employer from unilaterally modifying any provision of the collective agreement"); *Marine Pollution*, 88 B.R. at 594–95. *See also* 5 *Collier on Bankruptcy*, ¶ 1114.01 at 1113–11 (15th ed. 1989):

> Section 1113(f) reversed that part of *Bildisco & Bildisco* which held that a trustee or debtor in possession was not legally bound to a collective bargaining agreement subsequent to the filing date and prior to the court determination of the application for the authority to reject such agreement. The trustee or debtor in possession must adhere to the terms of the collective bargaining agreement unless the court approves the application for rejection pursuant to section 1113(c) or grants interim relief under section 1113(e).[8]

Absent compliance with the procedures for modification which applied in bankruptcy court, the legislation gives the debtor-employer no license to avoid its contractual obligations. Congress did not expressly indicate in section 1113, however, how or where such labor obligations were to be enforced when the debtor failed to honor them yet did not seek bankruptcy court approval to modify his collective bargaining agreement. It is therefore somewhat less obvious, after a bankruptcy petition has been filed, whether an employer's alleged unilateral breach of a collective bargaining agreement must be brought to the attention of the bankruptcy court in the first instance, or is subject to ordinary prosecution and resolution elsewhere, as provided for under the labor laws and in the parties' private contractual orderings.

For several reasons, the better construction is that such violations need not be brought before a bankruptcy court when the debtor has not sought relief from its labor contract obligations in the manner provided for under the bankruptcy laws.

---

**7.** The Congressional rejection of unilateral modification is further emphasized by § 1113(e), which provided that a debtor might obtain authorization from the bankruptcy court to implement interim changes in the collective bargaining agreement outside the timetable of § 1113(d) governing determination of an application for permanent relief, in the event such expedited changes were essential to the continuation of the debtor's business or necessary to stave off irreparable damage to the estate. Inclusion of such a provision would be pointless if it were contemplated that an employer would be permitted unilaterally to strip itself of such obligations. Also indicative of the Congressional position on the debtor's power to make immediate unilateral modifications is § 1113(d)(2), providing that if the bankruptcy court fails to rule upon an application for modification within 30 days of hearing, the debtor may *then* proceed unilaterally to institute modifications pending the court's ruling.

**8.** The rather meager legislative history of Section 1113—there are *no committee reports* on the Act—buttresses the point. *See, e.g.,* 130 Cong.Rec. S8898 (daily ed., June 29, 1984) (remarks of Sen. Packwood) ("prior to compliance with the provisions of [Section 1113] ... the labor contract is enforceable and binding on both parties ..."); 130 Cong.Rec. S6182 (daily ed., June 4, 1984) (Senators Hatch and Packwood) (all provisions of labor agreement remain in effect until bankruptcy court approves rejection), *portions reprinted in* Appendix 3, *Collier on Bankruptcy*, XX (15th ed. 1989). *See also In re Unimet Corp.*, 842 F.2d 879, 883–884 (6th Cir.1988) (*"Unimet"*) (recounting legislative history).

The first of these is that the evolution and purpose of section 1113 would be rendered insensible were the automatic stay construed to disable actions to enforce labor agreements brought against employers who did not avail themselves of section 1113.

By its terms Congress intended section 1113 to be the exclusive (the provision says "sole") means in the Bankruptcy Code by which a debtor could modify or reject its collective bargaining contract obligations. It is evident from the history of the events that Congress erected that requirement in response to *Bildisco*, in which several provisions of the Code, including the automatic stay, were read by the Supreme Court to mean that a debtor was relieved of the duty to adhere to labor contract obligations upon the filing of the petition. *See Bildisco*, 465 U.S. 513, 529–30, 532, 104 S.Ct. 1188, 1197–98, 1199 (majority opinion) (construing stay and other provisions as signifying that upon the "filing of the petition in bankruptcy ... the collective bargaining agreement is no longer immediately enforceable, and may never be enforceable again"); 465 U.S. at 550 n. 17, 104 S.Ct. at 1208 n. 17 (dissenting opinion) (noting majority "find[s] significance in[ ] the automatic stay provision").

This historical sequence strongly favors, if it does not compel, the conclusion that Congress, by its reversal of *Bildisco*, did not wish the automatic stay to govern collective bargaining agreements. Judicial construction of the automatic stay, post-*Bildisco* and post-section 1113, so as to disable workers from commencing or continuing suits or proceedings against the debtor-in-possession arising under collective bargaining agreements (suspending all such actions temporarily and in some cases, indefinitely), would debilitate the recognized Congressional purpose of making collective bargaining agreements enforceable against debtors until and "unless the court approves the application for rejection pursuant to section 1113(c) or grants interim relief under section 1113(e)." 5 *Collier on Bankruptcy*, § 1113.01 at 1113–11 (15th ed. 1989).

That was the basis for the decision of this court in *Marine Pollution*. Nothing presented on these appeals alters the wisdom expressed there that it would be "anomalous" to hold that the previously enacted section 362 invalidates (by rendering unenforceable) the terms of collective bargaining agreements which Congress determined in section 1113 were to "stay[ ] in full force and effect" until rejected or modified pursuant to that provision's procedures. *In re Marine Pollution Services*, 88 B.R. at 595; *cf. Unimet*, 842 F.2d at 884 (rejecting employer's reliance on another section of Code "to escape its obligations" under labor agreement in view of section 1113's "unequivocal" prohibitions of unilateral modification).

That conclusion is bolstered upon consideration of a principal purpose of the automatic stay. Designed as "one of the fundamental debtor protections provided by the bankruptcy laws," the stay is intended to "give[ ] the debtor a breathing spell from his creditors" and "relieve[ ] [him] of the financial pressures that drove him into bankruptcy." S.Rep. No. 95–989, 95th Cong., 1st Sess. 54–55; H.Rep. No. 95–595 95th Cong., 1st Sess. 340–341, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5840–41 (Senate Report), 5963, 6296–97 (House Report); *In re Stringer*, 847 F.2d 549, 551–52 (9th Cir.1988); *In re Colin, Hochstin Co.*, 41 B.R. 322, 355 (Bankr.S.D. N.Y.1984).

This policy of temporarily relieving the debtor, upon filing, from its obligations to creditors—well recognized in its general application—is precisely what Congress set out in section 1113 to alter in the special case of obligations owed to workers arising under collective bargaining agreements. The majority in *Bildisco* had recognized the Code's effort "to give a debtor-in-possession some flexibility and breathing space," and had concluded from its survey of the Code's provisions that Congress' "considered judgment regarding the extent to which special provisions should be afforded workers under the Bankruptcy Code" was limited largely to granting priority status to workers' unsecured claims. *Bildisco*, 465 U.S. at 529, 531 n. 12, 532,

104 S.Ct. at 1197, 1198 n. 12, 1199. Such special provisions, the Court said, did not include "requir[ing] adherence to the terms of the collective bargaining agreement" once a petition was filed. *Id.* at 532, 104 S.Ct. at 1199. Congress' response, set forth in 11 U.S.C. § 1113(f), was to legislate that the contrary rule would govern labor agreements: under the Code an employer could not "unilaterally terminate or alter any provision of a collective bargaining agreement" except in accordance with the procedures of section 1113.

Thus, the very point of section 1113 was to prevent employers from using the act of a bankruptcy filing to obtain an automatic "breathing spell" from their labor obligations, although the stay promised just such a spell with respect to other obligations. When it comes to labor obligations, the employer wishing to deviate from its contracted-for duties must make an application under section 1113 to the bankruptcy court and obtain its authorization. Absent the employer's invocation of that section's procedures to govern abrogate or modify its labor obligations, labor contract enforceability is unaffected by the bankruptcy laws, including the automatic stay. That is the manner by which Congress chose to distinguish labor agreements from other executory contracts, which bankruptcy laws render unenforceable against the debtor.

Against this interpretation, Eastern urges that section 1113, although meant to further labor contract enforceability, was intended to co-exist with the automatic stay. Driving the thesis is the observation, correct insofar as it goes, that the stay, apart from offering the debtor a "breathing spell," serves the purpose of centralizing dispute resolution in bankruptcy court. Achievement of that purpose assertedly does not impair enforcement of collective bargaining rights, as contemplated by sec-

tion 1113(f)—it merely channels enforcement efforts to the bankruptcy forum.

Although the argument accommodates the competing concerns of efficient administration of reorganization proceedings and enforcement of labor rights, the proposed accommodation is not likely the one Congress meant to implement when it enacted section 1113. First, Congress did not signal in section 1113 that it intended labor disputes generally, as distinct from those concerning applications for contract modification pursuant to that section, to be adjudicated in bankruptcy court, or for there to arise in bankruptcy court a cause of action under section 1113(f) to remedy contract breaches or violations of labor law whenever a debtor unilaterally terminates or alters a labor contract term. As structured, subsections 1113(a) to 1113(e) detail an affirmative and exclusive procedure by which the willing employer can avail itself of the bankruptcy laws to modify· its collective bargaining agreement. Section 1113(f) does not forbid use of other *non*-bankruptcy avenues of altering labor obligation; rather, it eschews the employer's reliance on any other *bankruptcy* provision to insulate the employer from the ordinary legal consequences of unilaterally terminating or altering its labor agreements. In short, the statute's facial purpose and intended effect is to place before the bankruptcy forum *debtor*-initiated applications for relief from collective bargaining agreements. *Century Brass Products,* 795 F.2d at 276 (debtor is "the moving-party seeking rejection of its collective bargaining agreement" and so bears the "burden of persuasion on the procedural and substantive standards of section 1113"). Absent the debtor's request for modification, the statute reveals no purpose to channel all actions to enforce or arbitrate existing, unmodified agreements into the single forum of the bankruptcy court.[9]

9. Casting further doubt on this "single bankruptcy forum" theory is the fact that a bankruptcy court resolving § 1113 applications of a debtor acts in a role quite distinct from that of a court, or arbitrator, applying labor and contract law principles to interpret or enforce an existing collective bargaining agreement. When the bankruptcy court determines a *debtor's* request to reject or modify a labor agreement under § 1113 of the Bankruptcy Code, it must "balance [ ] the equities." 11 U.S.C. § 1113(c)(3). As the Second Circuit observed in *Century Brass Products,* 795 F.2d 265, 273 (1986), this requirement "codifies the unanimous holding" in *Bil-*

Second, the argument is premised on the central, but questionable, notion that the bankruptcy court is necessarily available at the labor representative's asking to litigate labor disputes and to enjoin breaches of labor agreements. Unless that is universally so, the automatic stay would inhibit the legislative purpose of ensuring that filing of a bankruptcy petition does not interfere with the enforceability of collective bargaining agreements.[10] Nowhere, however, does the Code specify that the bankruptcy judge in fact is obliged to open the bankruptcy court as a forum for vindication of rights the assertion of which elsewhere has been stayed under 11 U.S.C. § 362(a).

Despite Eastern's assurances that the stay "does not apply to actions brought in bankruptcy court," some bankruptcy courts in fact have held that it does, and have dismissed claims against a debtor brought in the bankruptcy forum that were filed without obtaining leave under section 362(d). *See, e.g., Matter of Coastal Group, Inc.*, 100 B.R. 177 (Bankr.Del.1989); *In re Penney*, 76 B.R. 160, 161 (Bankr.N.D. Ca.1989); *Lessig Construction, Inc. v. Schnabel Associates*, 67 B.R. 436, 443–44 (Bankr.E.D.Pa.1986). In this last case, the

stay was applied even to bar claims of setoff asserted by counterclaim against a debtor in bankruptcy court after the debtor itself had instituted an adversary proceeding in that forum. *Lessig Construction*, 67 B.R. 436, 437. *Cf. In re Bell & Beckwith*, 50 B.R. 422, 429 (Bankr.N.D.Ohio 1985) (trustee's filing of adversary action against party had "effect of relieving the stay" as to party "for the limited purpose of [party's] asserting counterclaims" which related to trustee's allegations). *See also* 4 *Collier on Bankruptcy* ¶ 553.05[2], at 533–32 to 533–33 (creditor seeking to exercise post petition setoff "must first move for relief from automatic stay").

Under Eastern's view, then, the union might not be able to enforce its rights under a labor agreement against an unwilling debtor, anywhere, without first securing the permission of the bankruptcy court.[11] That appears to be exactly the reverse of the scheme passed by Congress, which places the burden on the *employer* to seek relief from the bankruptcy court if it wishes to rely on the bankruptcy process to escape from or alter its obligations under its labor contracts. The question of law is unsettled, *see In re Vylene Enterprises, Inc.*, 63 B.R. 900, 905–07 (Bankr.C.

*disco* that the decisionmaker consider the likelihood and consequences of liquidation without rejection, the reduced value of creditors' claims and subsequent hardships on them, and the impact on the employees. *Id.*, at 272. In performing that task, "the Bankruptcy Court must focus on the ultimate goal of Chapter 11 ... [of] how the equities relate to the success of the reorganization." *Bildisco*, 465 U.S. at 526, 104 S.Ct. at 1196, *quoted in Century Brass Products,* 795 F.2d at 272 n. 4. In contrast, where a debtor-employer has not sought relief under the equitable standards of § 1113, it remains bound by the existing, unaltered terms of the bargaining agreement and the labor laws. *See* 11 U.S.C. § 1113(f). The question for the court or arbitrator to determine is what the contract or the labor laws require, not how the contract equitably could be modified in accord with bankruptcy law concerns. Under the Congressional scheme, considerations relevant under § 1113, such as the success of reorganization, do not lawfully govern, or bear upon, the agreement's interpretation or enforcement prior to the debtor's § 1113 application. In view of these distinct decisional frameworks, it is even less obvious that Congress would have wished to make bankruptcy courts the principal forum for

resolution of labor contract enforcement matters, as distinguished from the forum for a debtor's modification of labor agreements, the process and standards for which it laid out in § 1113 of the Bankruptcy Code.

**10.** By its terms, the stay takes effect upon the bankruptcy filing and continues in force until the time a bankruptcy case is closed or dismissed, 11 U.S.C. § 362(c). The stay may be lifted by the court "for cause," a discretionary determination of the court that is made only after notice and hearing and is reviewable only under the abuse of discretion standard. *See* 11 U.S.C. § 362(d) & (e); *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y.1981). Suiting the stay's purpose of giving breathing space to the debtor, the provision contains no mechanism mandating removal or transfer of actions to the bankruptcy court in the event the bankruptcy court declines to allow an action to proceed elsewhere.

**11.** And if the bankruptcy court declined such permission, then the union would have no legal means by which to force the employer to live by the terms of its unmodified labor contracts.

D.Cal.1986) (automatic stay does not apply to proceedings initiated in bankruptcy court); *In re American Spinning Mills, Inc.*, 43 B.R. 365, 367 (Bankr.E.D.Pa.1984) (same), but the evident legal uncertainty as to the availability of the bankruptcy court as a forum in which workers automatically could obtain a hearing on claims brought to enforce labor rights forcefully undercuts the contention that Congress had understood bankruptcy courts to be the forum of first resort. Given the undisputed Congressional aim of keeping labor agreements enforceable until modified or rejected under section 1113, the potential unavailability of the bankruptcy forum for achievement of that purpose fortifies the contrary view, *viz.*, that the automatic stay does not bar proceedings outside of bankruptcy court that seek to compel the debtor to adhere to the terms of its collective bargaining agreements.

All of the reasons above support the conclusion reached in *Marine Pollution* that the automatic stay's application to labor proceedings does not survive the passage of section 1113. It is nevertheless true that in enacting section 1113, Congress did not expressly amend the automatic stay provision by adding to the list set forth at section 362(b) an exception for actions against the debtor brought by employees (or their labor representatives) arising under collective bargaining agreements. *See* 11 U.S.C. § 362(b).[12] That omission warrants attention since principles of statutory construction caution against repeals by implication.

No such implication is called for here. Congress, although it did not amend the language of section 362, effectuated the same end in the language of section 1113(f) —only there it expressed its purpose in a more thoroughgoing fashion that would prevent not only the automatic stay but any other lurking provision of Title 11 from interfering with enforcement of collective labor agreements. Section 1113(f) literally forecloses a court from any construction of the Bankruptcy Code, including the provisions of section 362(a) and the other sections of the Code that the majority in *Bildisco* relied upon, that would allow an employer in bankruptcy unilaterally to displace or revise its obligations under a collective bargaining agreement prior to its adherence to the provisions of section 1113. Section 1113(f) states: *"No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provision of a labor agreement...."* [13]

The automatic stay is a provision of Title 11, and, as noted, has as a purpose relieving debtors of their contractual obligations. Its application to actions or proceedings brought to enforce collective bargaining provisions has the immediate effect of permitting a debtor unilaterally to cease adhering to its collective bargaining agreement, without complying with the special bankruptcy procedures of section 1113. It therefore falls squarely within the intendment of section 1113(f), and, pursuant to the express Congressional instruction set

---

**12.** Nor did Congress preface § 1113 with language specifically excepting labor arbitrations or enforcement proceedings from the scope of the automatic stay. *See* 11 U.S.C. §§ 1110(a), 1168(a).

**13.** The wording of § 1113(f) ("No provision of *this* title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section") reveals that § 1113 was intended to override other provisions of Title 11, but not provisions of other laws. Thus, laws outside the Bankruptcy Code, such as the Railway Labor Act, might provide such license to implement contractual changes unilaterally. *See, e.g., Eastern Airlines,* No. 89 Civ. 8250(MBM), slip op. at 20, 1990 WL 5203 (January 24, 1990):

· Eastern's rights here are governed by *Brotherhood of Ry. & S.S. Clerks v. Florida East Coast Ry. Co.,* 384 U.S. 238 [86 S.Ct. 1420, 16 L.Ed.2d 501] (1966), which holds that once a union is free to strike, a carrier is also free to rely on self-help by making unilaterally those contract changes "reasonably necessary" for continued operation. 384 U.S. at 244, 247–48 [86 S.Ct. at 1423, 1425].... [N]othing in *Florida East Coast* holds that advance approval from a court must be secured. To the extent there is authority on that subject, it is to the effect that such approval is not generally necessary. *Railway Executives Ass'n v. Boston & Maine Corp.,* 639 F.Supp. 1092 (D.Me), *modified on other grounds,* 808 F.2d 150 (1st Cir. 1986), *cert. denied,* 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987).

forth therein, may not be applied to stay such actions or proceedings.

In view of the language Congress employed at section 1113(f), these appeals therefore do not present a situation calling into application the "cardinal rule ... that repeals by implication are not favored." *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974) (citations omitted). Under *Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80, the "actual intent of Congress," expressed directly in section 1113(f), is to modify the automatic stay as well as other provisions of the Bankruptcy Code, to the extent these Title 11 provisions had in the past or might again in the future be construed to permit an employer to avoid adherence to the terms of a collective bargaining agreement prior to abiding the procedures of section 1113.

E.  *Application to the LPP Arbitration and Wet–Leasing Suit*

  (i)  *The LPP Arbitration*

■ In the case of the first appeal, Eastern's proposed construction of the automatic stay has had precisely this consequence of permitting an employer to avoid a term of its labor agreement. ALPA seeks to arbitrate a labor dispute arising under the LPP provisions of the collective bargaining agreement. The parties' collective bargaining agreement and the LPP provisions both require arbitration of disputes which arise under them. Relying on the automatic stay for protection, Eastern has declined to abide by these provisions, refusing to proceed to such an arbitration. Eastern has thereby succeeded in "unilaterally terminating" a provision of the collective bargaining agreement without relying on the provisions of section 1113—the exclusive vehicle under the Bankruptcy Code by which a debtor may terminate or alter a collective bargaining provision.

To read the stay to sanction Eastern's refusal to arbitrate thus quite literally violates section 1113(f)'s requirement that no provision of the Code be construed to permit unilateral termination or alteration "of any provisions of a collective bargaining agreement prior to compliance with the provisions" of section 1113.[14] To be sure, the "stay" of an arbitration proceeding is not necessarily a permanent proscription (stays can be lifted upon a showing of "cause"), nor a rejection, termination or alteration of the entire contract. Nevertheless, section 1113(f) speaks to the unilateral rejection or alteration of *any* of· the provisions of a collective bargaining agreement, *Unimet,* 842 F.2d at 883, and the precise period in which it forbids the debtor's unilateral rejection or alteration of contract terms is the time running from the filing of the bankruptcy petition until the court's approval of any proposed changes in the contract under section 1113. Thus, the fact that the stay is not necessarily equivalent to a permanent change in a labor agreement in no way removes the automatic stay's operation from the scope of section 1113(f). That point is reinforced by section

---

**14.** The argument that the relief provided by the stay is not a consequence of a "unilateral" decision to modify or terminate a labor agreement—the explicit concern which § 1113(f) addresses—but rather, is outside the scope of the § 1113(f) override because eventuated by operation of law suffers from at least two frailties. First, the point misreads the meaning of "unilateral" as used in the legislation. In the context of § 1113, "unilateral" alterations by an employer most intelligibly refers to deviations from the terms of the collective bargaining agreement that are unapproved of by the bankruptcy court, *i.e.,* alterations that arise other than in accordance with the court-sanctioned modification procedures that Section 1113 itself outlines. Second, the argument relies upon a sense of "unilateral" exactly parallel to that employed by the majority in *Bildisco* to hold that the labor laws could not be applied to enforce a debtor's adherence to its labor contracts. *See Bildisco,* 465 U.S. at 533, 104 S.Ct. at 1199 ("In a Chapter 11 case ... the 'modification' in the agreement has been accomplished not by the employer's unilateral action, but rather by operation of law. Since the filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable, § 8(d) procedures [prohibiting unilateral modifications] have no application to the employer's unilateral rejection of an already unenforceable contract.") As Congress by passing Section 1113 repudiated the notion that by operation of law, "the filing of a petition in bankruptcy under Chapter 11 makes the contract unenforceable," it would be rash to assume that the argument underpinning that holding survived enactment of the same law.

1113(e), which empowers the court under emergency conditions to authorize the debtor to implement "interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement." That provision would be pointless if section 1113(f) were read to permit the debtor to deviate unilaterally, but only "temporarily," from the terms of the agreement.

Moreover, in view of the prevalence of arbitration provisions in collective bargaining agreements,[15] application of the automatic stay to allow debtors to evade arbitral terms would cause section 1113(f) to be observed most commonly in the breach. Such unsanctioned alterations in the parties' chosen forum for the vindication of their respective economic rights may not be the sort of modification or termination that Congress had first in mind when it reversed *Bildisco's* holding approving of an employer's abrogation of its contractual obligations upon a bankruptcy filing.[16] Even if the history of section 1113 fails to evince that its focus was to preserve arbitration as the principal means for resolution of contractual disputes involving companies in bankruptcy absent the employer's application under that section for relief from an arbitration clause, that result nevertheless is required by the express language of the statute. Prior to the debtor's adherence to the procedures set forth in section 1113 for modification, section 1113(f) grants the debtor no license to "terminate or alter *any*

provisions" of a collective bargaining agreement. 11 U.S.C. § 1113(f); *see also Unimet*, 842 F.2d at 883 (rejecting, in view of "any provision" language of statute, employer's argument that § 1113 does not apply to retiree benefits term of labor contract). There is no basis for withholding application of that section to permit debtors to deviate unilaterally from arbitration clauses of labor agreements, any more than any other contractual term to which they have committed themselves.[17]

### (ii) *The Wet–Leasing Action*

In the case of the second appeal, the automatic stay has equally served to foreclose ALPA's enforcement of contractual provisions, and to deter Eastern's invocation of section 1113 procedures.

ALPA instituted the wet-leasing litigation in federal court in September 1989, soon after learning that Eastern had initiated the practice of leasing planes with crews from Continental. A preliminary injunction hearing was scheduled by the federal district court and expedited discovery was authorized. Before the hearing could be held, Eastern applied to the Bankruptcy Court here for a ruling that the automatic stay prevented ALPA from going forward with its suit, which assertedly was one to enjoin rejection by Eastern of provisions of a collective bargaining agreement. The court's ruling that the stay governed that action thus has prevented ALPA from re-

---

**15.** Over 95% of all collective bargaining agreements provide for arbitration. *See* J. Getman & J. Blackburn, *Labor Relations: Law, Practice and Policy* 356 (2d Ed.1983).

**16.** *Bildisco* itself involved an employer's unilateral refusal to continue making contractually-mandated fringe benefit and wage increases. 465 U.S. at 519, 104 S.Ct. at 1192. The dissent noted with concern other recent unilateral modifications in the economic terms of collective bargaining agreements instituted by Continental Airlines and Wilson Foods Corporation following their filing of Chapter 11 petitions which, similarly, took the concrete form of wage reductions (ranging from 40 to 50%). 465 U.S. at 549 n. 16, 104 S.Ct. at 1208 n. 16. The Congressional history also appears to focus on such substantive economic modifications. *See, e.g.,* 130 Cong.Rec. S8899 (June 29, 1984) (statement of Sen. Moynihan) (noting one airline company's

use of bankruptcy filing to reduce wages by 60%).

**17.** Engrafting such an exception upon § 1113(f) also would impair the federal policy favoring arbitration of labor disputes enunciated in the celebrated Steelworkers Trilogy. *United Steelworkers v. Warrior & Gulf Navigation*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409; *see also Union Pacific R. Co. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (RLA embodies strong policy favoring arbitration of disputes concerning interpretation of collective bargaining agreement); *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 1546, 1555 (11th Cir.1988) (labor arbitrators have "a special competence not shared by a federal court that will enable the [arbitrator] wisely to construe language that may appear too vague to even the most intrepid of generalist judges").

ceiving a determination on the merits of its wet-leasing enforcement claim.

So long as the automatic stay is deemed in force, ALPA cannot easily obtain an order forcing Eastern to cease wet-leasing, and Eastern has little incentive to seek relief under the standards of section 1113 from the provisions of its collective bargaining agreement, assuming those provisions actually do prohibit wet-leasing. Meanwhile, the interruption and interference worked by the stay effectively may have mooted that part of ALPA's claim which sought injunctive relief against the wet-leasing practices, which Eastern has indicated were temporary in nature and are now abating.

Neither of these outcomes could have been what Congress had in mind when it reversed *Bildisco*. The automatic stay's continued application to labor disputes is fundamentally inconsistent with its enacted policy of keeping labor contracts enforceable until modified in accordance with section 1113. Accordingly, as required by section 1113(f), section 362(a) of the Bankruptcy Code may not bar ALPA from proceeding with the wet-leasing lawsuit, nor require ALPA to obtain the Bankruptcy Court's permission under section 362(d) before commencing an arbitration with respect to the LPP merger condition.

II. *The Bankruptcy Court's Injunction of the Wet–Leasing Action Contravenes Section 105 and Section 1113 of the Bankruptcy Code.*

■ Section 105(a) of the Bankruptcy Code provides that a bankruptcy court "may issue any order ... that is necessary to carry out the provisions of this title." 11 U.S.C. section 105(a). Pursuant to this provision, the Bankruptcy Court has "broad equitable powers to preserve its own jurisdiction." *In re Chateaugay Corp.*, 93 B.R. 26, 29 (S.D.N.Y.1988). These powers include staying proceedings which otherwise remain unaffected by the automatic stay, where necessary under the

provisions of Title 11 "to assure the orderly conduct of the reorganization proceedings." *In re Baldwin–United Corp. Litig.*, 765 F.2d 343, 348 (2d Cir.1985) (citation omitted); *see also In re Neuman*, 71 B.R. 567, 573–74 (S.D.N.Y.1987) (section 105(a) injunction against state court action unaffected by section 362 appropriate where such a "foray to [an]other forum[ ] to determine what is property of the estate for purposes of bankruptcy law ... [would] disrupt the heart of the duties that the [bankruptcy] court is designed to perform"); *In re Johns–Manville Corp.*, 52 B.R. 879, 889 (Bankr.S.D.N.Y.1985), *aff'd*, 60 B.R. 842 (S.D.N.Y.), *rev'd on other grounds*, 801 F.2d 60 (2d Cir.1986).

Were the prospect of interference with the reorganization effort always legally sufficient to support an order under section 105, the Bankruptcy Court order here in question would appear to satisfy that standard. Judge Lifland determined below that the injunctive relief sought by Eastern was "essential" to the reorganization effort. *Ionosphere II* at 776. That determination was predicated on the court's findings that the wet leasing practices Eastern had initiated "were, and are, reasonably necessary to Eastern's efforts to rebuild its operations," *Ionosphere II* at 775, and that the injunctive relief sought by ALPA in federal district court—stopping the wet-leasing practices as in violation of Eastern's labor contract—would, if awarded, cause "turmoil," loss in profits from wet leased operations, and "substantial erosion of Eastern's operations." *Id.* at 775–76. For these principal reasons, the court found that ALPA's lawsuit to enjoin Eastern's alleged unilateral deviation from its labor obligations interfered significantly with the reorganization proceedings and the court's jurisdiction over the administration and operation of the estate.[18]

Such a finding ordinarily will support an injunction under section 105(a) as "necessary to carry out the provisions of this title," 11 U.S.C. section 105(a), since, as the

---

18. The court also found that permitting the lawsuit to go forward would interfere with the bankruptcy proceeding by "burden[ing] Eastern's estate" (because defending the lawsuit would require expenditures of resources) and "divert[ing] attention from an essential task in the case," *viz.,* the filing of a plan of reorganization. *Id.* at 775–76.

Bankruptcy Court held, rehabilitation of the debtor is a "[p]aramount policy and goal of Chapter 11." *Ionosphere II* at 777. However, section 105(a) does not permit a bankruptcy court's view of the steps appropriate or necessary to implement the policy of debtor rehabilitation to supplant or subordinate specific Congressionally-determined bankruptcy procedures or policies regulating its achievement. The court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988); *Guerin v. Weil, Gotshal & Manges*, 205 F.2d 302, 304 (2d Cir.1953) ("exercise of [bankruptcy court's] equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act").

Thus, section 105(a) "does not empower courts to issue orders that defeat rather than carry out the explicit provisions of the Bankruptcy Code ..." *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080 (9th Cir.1989). Where the Code provides a circumscribed means for a debtor (or some other party in interest) to obtain a form of relief, the Congressionally-set standards and procedure must be observed. In lieu of the debtor's satisfaction of those standards and procedures, a Bankruptcy Court may not lawfully use its equitable powers under section 105(a) to provide the same or equivalent relief, notwithstanding that such a use of its powers would facilitate the debtor's rehabilitation, aid the reorganization process, or serve some other important bankruptcy goal.

That appears to be the teaching of numerous recent decisions of the Supreme and circuit courts, and to hold otherwise would permit debtors or other parties to bypass specific, Congressionally-established bankruptcy standards. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 209, 108 S.Ct. 963, 968, 970, 99 L.Ed.2d 169 (bankruptcy court cannot employ equitable powers to grant exception to "absolute priority" rule of section 1129, so as to enable debtor to retain equity interest in family farm; "relief from the current farm woes cannot come from a miscon-

struction of the applicable bankruptcy laws, but rather, only from action by Congress."); *Sea Harvest*, 868 F.2d at 1077 (where debtor failed to satisfy requirements for assumption of leasehold contained in section 365 of Code, section 105 does not provide an equitable exception operating in aid of debtor); *In re NWFX, Inc.*, 864 F.2d 593, 595–96 (8th Cir.1989) (section 105 does not authorize bankruptcy court to permit equitable setoff when requirements for setoff set forth in section 553 of Code were not satisfied); *In re Shoreline Concrete Co.*, 831 F.2d 903, 905 (9th Cir.1987) (error to rely on equitable powers to reduce fee amount owed by debtor under statutory fee provision of Bankruptcy Act); *Matter of Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7th Cir.1986) (bankruptcy court cannot use its equitable powers to disallow acceleration clause in solvent debtor's contract); *United States v. Sutton*, 786 F.2d 1305, 1307–08 (5th Cir.1986) (no license under section 105 to authorize post-petition payments to spouse of debtor where section 502(b)(5) disallows claims for support that are unmatured on date of petition filing); *see* 2 *Collier on Bankruptcy*, ¶ 105.04 at 105–15 n. 5 (15th ed. 1989) (citing additional cases).

Although none of these cases involved the particular form of equitable relief awarded below—an injunction to prevent a proceeding to enforce a labor agreement—there is no apparent basis for excusing that form of equitable relief from the general constraint recognized in section 105(a) and in these cases: that the equitable powers of the bankruptcy court be exercised in a manner consistent with, and only as necessary to carry out, the provisions of the Code. That did not occur here.

The bankruptcy court below used its equitable powers under section 105(a) to provide relief to Eastern that Congress had determined, as a matter of bankruptcy law, should be available only to debtors who have observed the procedures and satisfied the standards of section 1113. That law, as noted, requires that the employer seeking to alter its labor practice first bargain in

good faith with the union, and, that effort failing, establish both that proposed changes are "necessary to permit the reorganization," and that the balance of equities "clearly favors" the debtor-proposed modifications. 11 U.S.C. § 1113(c). Eastern chose not to invoke those legislated procedures. Nor did it choose to defend in federal court in Florida its wet-leasing practices as consistent with its existing labor obligations. Instead, Eastern requested under section 105(a) that the bankruptcy court enjoin ALPA's Florida action to enforce the collective bargaining agreement, because the relief ALPA sought in Florida—an injunction against wet-leasing—would impair or prevent its reorganization under Chapter 11.

That justification is legally irrelevant to a determination under labor and contract law of the pilots' rights under the existing agreement (the adjudication which ALPA had sought in Florida), and, although highly relevant to an application under section 1113 of the Bankruptcy Code, is legally insufficient under the standards of section 1113(c) to warrant relief. Nevertheless, by proving to the satisfaction of the Bankruptcy Court that wet-leasing was "necessary" and "essential" to its reorganization, *Ionosphere II*, Factual Findings No. 15 & 35, Eastern managed to enjoin ALPA's lawsuit brought to force Eastern to adhere to its labor obligations under the collective bargaining agreement and, thereby, avoid having either to (a) defend its labor practices under its existing labor agreements and the labor laws or (b) justify modification of those practices under the standards set forth at bankruptcy law.

That relief, fashioned in effect by the Bankruptcy Court's injunction, is more expansive than that available under section 1113 of the Bankruptcy Code—yet Eastern obtained it without satisfying either that provision's procedural requirements or substantive standards. The order occasioning such relief therefore cannot fairly be said to have effectuated the provisions of the Bankruptcy Code, as required by section 105(a). To the contrary, the effect of the court's order below was to "defeat rather than carry out the explicit provisions of the Bankruptcy Code," *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080 (9th Cir.1989), by creating from equity a bankruptcy vehicle for debtors to avoid enforcement of collective bargaining obligations other than the exclusive and precise one Congress crafted.

That the order enjoining the wet-leasing action actually disserves the specific provision of the Code that addresses the debtor's relief from collective bargaining obligations distinguishes the equitable order in this case from the injunction of state court proceedings approved of in *In re Neuman*, 71 B.R. 567 (S.D.N.Y.1987). The injunction there served to protect the bankruptcy court's jurisdiction over a matter that already had been addressed in the reorganization proceeding and which previously had resulted in an order of the court. As the reviewing court noted, the later-initiated state court lawsuit brought by the debtor was intended "to determine what is property of the estate for purposes of bankruptcy law" and to alter the effect of a bankruptcy court order bearing on that question that already had been issued. 71 B.R. at 573–574. Thus, the injunction of the proceedings outside of bankruptcy court, far from having the effect of permitting a debtor to bypass or evade Congressionally-specified procedures in bankruptcy for obtaining relief, furthered precisely the opposite one of preventing the debtor from evading the effect of the bankruptcy court's orders issued pursuant to the Code.

Here, by contrast, ALPA's suit in the Florida federal court was not an attempt to evade any bankruptcy order. ALPA there pursued no relief under the Bankruptcy Code, the substantive legal issues it raised had not been addressed or determined in the bankruptcy proceeding, and resolution of its suit did not require that any bankruptcy—as opposed to labor or contract—law issue be addressed or determined. This external proceeding therefore did not threaten to disrupt "the heart of the duties that the [bankruptcy] court is designed to perform," *In re Neuman*, 71 B.R. at 574, which, with respect to labor issues, Congress has defined as the hearing and deter-

mination of debtor-initiated applications presented to the court under section 1113. Eastern did not initiate such an application, declining to seek sanction under the Bankruptcy Code for its wet-leasing practices in the manner Congress contemplated. The Bankruptcy Court's finding that it was "primarily charged" with determining applications under section 1113, sound in itself, thus can not support its reaching out to stay the Florida action, given that no section 1113 application to hear and determine was before it.[19]

The Bankruptcy Court's more general jurisdiction over the labor contract as property of the estate similarly was not in need of protection by injunction. The absence of a section 1113 filing does not appear to divest bankruptcy courts of jurisdiction over labor contract issues related to the bankruptcy proceeding, where the debtor has chosen to place such issues before it for determination by means other than a section 1113 filing, such as an adversary proceeding. Presumably, under such circumstances there could arise the need to issue a stay to prevent impairment of that jurisdiction by a subsequent-filed proceeding elsewhere. Here, however, the Bankruptcy Court had no jurisdiction over the contractual and labor law issues to protect, by injunction or otherwise, since neither ALPA or Eastern had filed an adversary complaint with that court placing those legal issues in dispute, nor otherwise sought its determination of the lawfulness of wet-leasing under either contract or labor law. Cf., Eastern Airlines, Inc. v. Air Line Pilots Association, International, Eastern Air Line Master Executive Council, Adv.Pro. No. 89–6590A (BRL) (adversary proceeding initiated by Eastern in bankruptcy court in December 1989 to resolve various other labor contract and labor law issues).

In sum, notwithstanding its conclusion that an order enjoining wet-leasing would interfere with the reorganization, the Bankruptcy Court was not authorized by section 105(a) to interfere with the issuance of such an order. The legality of the wet-leasing practice under the existing labor contract and labor laws had not been presented to that court by the parties, nor had Eastern presented to the Bankruptcy Court, under the only *Code* provision that supports an order of labor relief, a case for modification of the labor contract to permit wet-leasing. General title 11 policies favoring bankruptcy court oversight of the reorganization proceeding and the debtor's rehabilitation (and injunctions issued in furtherance of those general policies) must under these circumstances give way to Congress' particularized determination that labor agreements remain enforceable post-filing and that section 1113 be the exclusive vehicle under title 11 by which the debtor be relieved from obligations under those agreements. To hold otherwise would facilitate evasion of the scheme enacted by Congress.

\*      \*      \*      \*      \*      \*

These holdings will, according to the findings of the Bankruptcy Court, result in disruption of the reorganization proceeding and impairment of Eastern's rehabilitation. In both of his rulings below, Judge Lifland determined that the actions ALPA has sought to proceed with elsewhere—an arbitration to determine whether the LPP merger condition has been satisfied and a lawsuit over the legality of Eastern's wet-leasing practices—presented questions whose resolution could affect the possible

---

19. Compare *In re Goodman*, 873 F.2d 598, 603 (2d Cir.1989), which, although decided on quite different facts, also ordered that an injunction issued by the bankruptcy court be lifted to allow certain labor law questions first raised before the National Labor Relations Board to be determined there. The case, decided on primary jurisdiction grounds, did not present to the Second Circuit questions of possible evasion of § 1113, since the corporations being sued by the NLRB had long since been discharged in bankruptcy. Other cases, cited by Eastern as supporting a bankruptcy court's authority to enjoin labor contract proceedings elsewhere, all involved bankruptcy proceedings initiated prior to the passage of § 1113 and so did not consider the impact of § 1113 on the exercise of that authority. *See NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695 (8th Cir.1985); *General Athletic Products Co. v. N.L.R.B.*, 33 B.R. 1019 (S.D. Ohio 1983; *In re Unit Parts Company*, 9 B.R. 380 (Bankr.W.D.Okla.1981).

success or failure of Eastern's reorganization plan.

That determination resembles, and receives support from, the conclusion reached by Judge Mukasey in his January 24, 1990 decision, *Eastern Airlines, Inc. v. Air Line Pilots Association, International, Eastern Air Line Master Executive Council*, 89 Civ. 8250 (MBM) (*"Eastern Airlines"*). Rejecting ALPA's contention that the Bankruptcy Court did not have *jurisdiction* under 28 U.S.C. § 157(b) over the grievances that had been placed before it by the adversary complaint of Eastern (an issue not placed in question here), Judge Mukasey remarked upon the substantial effect resolution of the grievances elsewhere would have upon the estate.

In such circumstances, one of the advantages of arbitration when the employer is not in reorganization—finality—becomes a potentially devastating disadvantage. The only basis for review of arbitral decisions under the RLA are failure to comply with the requirements of the RLA, failure of the arbitral board to conform, or to confine itself to matters within the scope of its jurisdiction, and fraud and corruption. *Sheehan*, 439 U.S. at 93 [99 S.Ct. at 402]. No arbitrator can possibly be as aware as the bankruptcy judge supervising Eastern's reorganization of how that reorganization will be affected by an arbitral ruling. That presents the distinct possibility that even if ALPA prevailed at an arbitration it could find itself with an irreversible triumph over a carrier that cannot be successfully reorganized—precisely the Pyrrhic victory ALPA said at oral argument it wishes to avoid.

*Eastern Airlines*, slip op. at 23–24.

These legitimate concerns may call into question the wisdom, but do not undermine the lawfulness, of the Congressional determination to place upon the debtor the burden of seeking affirmative relief in bankruptcy from its obligations under collective bargaining agreements, in those circumstances where the debtor believes its financial condition requires or warrants alteration of any of those labor obligations.

Where the costs or risks of arbitration of labor disputes are so great as to truly impair a particular debtor's reorganization, the immediate resolution of that problem lies in the hands of the debtor. By availing itself of the procedures of section 1113, including the emergency provision set forth at section 1113(e) permitting interim modifications in collective bargaining agreements, the debtor may overcome impediments to reorganization those agreements pose, provided they are in fact formidable and the proposed resolution is found to be fair. The debtor-employer who refrains from seeking relief under section 1113, however, must expect to defend its labor practices under the existing terms of its collective bargaining contracts—including arbitration clauses—and the provisions of the labor laws. If it believes litigation of its more significant labor practices under the standards of the labor contract and the labor laws would best be centralized in the bankruptcy court, the debtor-employer must act to secure such determinations there, by submitting the disputes to that court in a timely fashion.

*Conclusion*

Because section 1113 modifies the automatic stay set forth at section 362(a), the decision of the Bankruptcy Court refusing to lift the stay to permit arbitration of the LPP dispute is vacated. Because neither section 105(a) nor the automatic stay authorized the Bankruptcy Court to enjoin ALPA from proceeding with the wet-leasing action, the order enjoining ALPA's prosecution of that suit is reversed. In view of these determinations, it is unnecessary to consider whether the Bankruptcy Court abused its discretion in refusing to grant ALPA's application to lift the automatic stay to go forward with the LPP arbitration nor whether the Norris–La Guardia Act bars a bankruptcy court from ever enjoining an action seeking to enforce rights under a collective bargaining agreement.